The Law Office of Ryan Lozar, P.C.
305 Broadway, 10th Floor, New York, NY 10007
Tel: (310) 867-1562; Alternate Tel: (646) 666-8262; Fax 1-877-666-4456
ryanlozar@gmail.com
www.ryanlozar.com/www.luchaportusderechos.com



JULY 31, 2016

The Honorable Cheryl L. Pollak
United States District Court for the Eastern District of New York

Re:   Akpoke v. City of N.Y. et al., No. 15 Civ. 6960 (ILG) (CLP)

Dear Judge Pollak:

      I represent Plaintiff Nchewi Akpoke in the above-captioned Section 1983 police misconduct litigation.  I write to request that the August 18, 2016, settlement conference be converted to an in-person discovery status conference to discuss various discovery disputes.  Mr. Akpoke does not think that the settlement conference would be fruitful at this time because he would like to first receive outstanding discovery.  I will discuss certain discovery disputes in this letter.  I have conferred with Defense counsel.

    I.      **Background**

      On or about July 3, 2015, Mr. Akpoke was driving with his friends Prince Harris and D.C. in Staten Island when Defendants stopped his vehicle without cause.  Defendants removed Mr. Akpoke and his friends immediately, also without cause.  One of the Defendants (on information and belief, Defendant Officer Hesterhagen) intentionally banged Mr. Akpoke's head into the vehicle, causing him great pain and fear.  Defendants then unlawfully searched the vehicle.

      According to Defendants, the reason they removed Mr. Akpoke and his friends from the vehicle then searched it was because they saw a machete-style knife lying on the floor of the vehicle.[1]  Defendants claim that the search was incident to a lawful arrest because they state that they could have arrested Mr. Akpoke for possessing the machete.  Mr. Akpoke disputes this because it was not unlawful for him to have the machete and, in any event, the scope of the search—which included breaking apart the vehicle's dashboard looking for contraband—bore no relationship to the detainees' grabbable areas.  Exhibit B (one photograph of the broken dashboard which has been produced in discovery).

      Relating to the lawfulness of the machete, first, the knife was covered by a black sheath and lying on the floor of the vehicle, a fact that Defendants' own statements and evidence vouchers corroborate.  Insofar as New York Penal Law Section 265.01(2) only criminalizes the possession of a machete "with intent to use the same unlawfully against another," it is difficult to understand how Defendant Officers reasonably believed that Mr. Akpoke or any of the vehicle's occupants intended to use a sheathed tool they were not touching against another person.  See People v. Campos, 93 A.D.3d 581, 581 (1st Dep't 2012) ("Some weapons are illegal per se, regardless of intent, but a machete is not one of those weapons.  Possession of a machete is only criminal when the possessor intends to use it unlawfully against another.").  Next, insofar as New York City Administrative Code Section 10-133(b) prohibits the possession of a knife with a blade length of four inches or more in a "public place," courts

---

[1] Mr. Akpoke used the machete as a tool in his mother's dense garden, which covers nearly every square foot of the backyard of the family's Staten Island home.  I visited the garden recently and took photographs which have been produced to Defendants.  Exhibit A (one of many photos of the garden).

have held that the interior of a person's vehicle does not become a public place by virtue of a police stop.  See, e.g., People v. Humphrey, 20 Misc.2d 879 (N.Y.C. Crim. Ct. 2008).

Indeed, Defendant Officers seemed to have eventually recognized that they could not arrest Mr. Akpoke for possession of the machete because although they claimed to have searched him and his vehicle in connection with a lawful arrest for possessing the machete, the arrest paperwork states his offense as possession of a different knife altogether.

Defendants claim that they eventually found a second knife—they unreasonably and incorrectly called this knife a gravity knife and this became the thing that Mr. Akpoke was charged with possessing instead of the machete—on Mr. Akpoke's person.  This was not true.  Defendants stated that they found a bludgeon on Mr. Harris's person.  This was not true.  Defendants arrested Mr. Akpoke and Mr. Harris for possession of those respective items and seized Mr. Akpoke's vehicle.  Defendants searched the vehicle even further at the precinct without a warrant.

The government offered Mr. Akpoke a charge bargain, stating that they would reduce the charge to a disorderly conduct violation if he would plead guilty.  Mr. Akpoke agreed with the understanding that part of the benefit of the deal was the automatic sealing of the records as provided for by New York Criminal Procedure Law Section 160.55.  At this writing, roughly one year later, Mr. Akpoke has not received this promised benefit.  Recently, I went to the Richmond County Criminal Court records department.  Without identifying myself as Mr. Akpoke's counsel, I requested the records and they were provided to me.  See, e.g. People v. Nicholas, 19 Misc. 3d 322, 327 (City Court, Feb. 11, 2008) (granting the defendant's motion to withdraw her guilty plea to a disorderly conduct violation reduced from the original charge for which she was arrested due to the failure to provide her with automatic statutory sealing).  I later identified myself to the clerk as Mr. Akpoke's counsel and inquired whether the records were sealed, and it was confirmed that they were not.

## II.     Mr. Akpoke Continues To Request His Color Mugshot

As the Court may recall, an ongoing dispute relates to Defendants' failure to produce a color version of Mr. Akpoke's mugshot.  Defense counsel has stated that he believes the mugshot's digital file was deleted and paper copies of the color mugshot destroyed.  The following facts and argument suggest that additional searching will result in the location of the mugshot.

New York Criminal Procedure Law § 160.55 is relevant to this question.  That law provides that:

> [u]pon the termination of a criminal action or proceeding against a person by the conviction of such person of . . . a violation, . . . the clerk of the court wherein such criminal action or proceeding was terminated shall immediately notify the commissioner of the division of criminal justice services and the heads of all appropriate police departments and other law enforcement agencies that the action has been terminated by such conviction.  Upon receipt of notification of such termination . . . every photograph of such person and photographic plate or proof, and all palmprints and fingerprints taken or made of such person pursuant to the provisions of this article in regard to the action or proceeding termination, and all duplicates and copies thereof, . . . shall forthwith be, at the discretion of the

<u>recipient agency</u>, either destroyed or returned to such person, or to the attorney who represented such person at the time of the termination of the action or proceeding[.]

N.Y. C.P.L. § 160.55(1)(a) (emphasis added).

Section 160.55 goes on to provide that "all official records and papers relating to the arrest or prosecution, including all duplicates and copies thereof, on file with the division of criminal justice services, police agency, or prosecutor's office shall be sealed and not made available to any person or public or private agency." N.Y. C.P.L. § 160.55(1)(c).

In light of the fact that I personally visited the court records office and learned that the clerk of the court has not sealed Mr. Akpoke's records pursuant to Section 160.55(1)(c) despite termination of the action by conviction of a violation, I argue that it is not likely that the clerk took the steps detailed in Section 160.55(1)(a) to notify various agencies that was just last month able to go to the court records office. In fact, the clerk eventually realized this error because when I asked her whether a color mugshot was in the file, pointing out that other files in plain view on the counter (including that of Mr. Harris) contained a copy of the color mugshot. The clerk became defensive and she refused to tell me. Even after I identified myself as Mr. Akpoke's attorney and produced an executed release form authorizing the court to release his records relating to this incident to me, the clerk refused to tell me.

I mention all of this not because I expect the Court to address the government's failure to seal Mr. Akpoke's record despite inducing him to plead guilty in exchange for that promise, or because I expect the Court to address the afore-mentioned clerk's poor service. Instead, I mention this because I argue that the facts I herein detail show that the color mugshot was not, as Defendants speculate, deleted or destroyed pursuant to Section 160.55. In fact, quite the opposite is true, <u>i.e.</u>, the government has failed to follow Section 160.55 with respect to Mr. Akpoke's case at all. I respectfully suggest that Defendants would be able to locate the mugshot by consulting all the various offices that Section 160.55 contemplates might have it, including but not limited to the Richmond County Criminal Court records office.[2]

### III. Mr. Akpoke May Move To Withdraw His Guilty Plea In State Court

Although it would not delay this action, I would like to alert the Court to the fact that Mr. Akpoke is considering whether to move in state court to withdraw his guilty plea in the underlying action due to the fact that Mr. Akpoke has not realized the benefit of the People's promise to seal his records in exchange for his agreeing to a conviction of a violation.

In <u>People v. Nicholas</u>, 19 Misc. 3d 322, 327 (City Court, Feb. 11, 2008), the court granted the defendant's motion to withdraw her guilty plea to a disorderly conduct violation reduced from the original charge for which she was arrested, when she was deprived of automatic statutory sealing. The

---

[2] This effort is important even if Defendants could show that the clerk of the court sent out notice about the conviction of a violation because Section 160.55(1)(a) states that upon receiving such notice each agency has the discretion to dispatch with the mugshot in any number of ways. Thus, while the police precinct might say that it shredded the photo, another law enforcement agency might say that it negligently failed to destroy. Yet another law enforcement agency might say that it mailed the materials to an individual whom it believed to be Mr. Akpoke's attorney, which Section 160.55 permits, in which case that would provide a meaningful lead. (I have consulted with the supervisor of whom I believe to have been Mr. Akpoke's actual attorney, who has told me that he could not locate it.)

Nicholas court stated that Section 160.55 requires that the People give notice to a criminal defendant "of an intention to not seal the record at any time prior to the defendant's plea to a charge reduced from a crime to a violation under CPL 160.55(1)[.]" (emphases added). Otherwise, the defendant's agreement to accept the charge bargain is null and void because it is made without a "full understanding of what the plea connotes and its consequences," People v. Ford, 86 N.Y.2d 397, 402-03 (1995), and thus does not represent "a voluntary and intelligent choice among the alternative courses of action open to the defendant,'" id. (citing North Carolina v. Alford, 400 U.S. 25, 31 (1970)).

## IV.  Mr. Akpoke Has A Valid False Arrest Claim

Discovery has been hampered in this case by Defendants' claim that Mr. Akpoke does not have a false arrest claim such that they should not have to produce material relating to the alleged gravity knife. I disagree with Defendants' position.

First and most simply, I argue that insofar as Mr. Akpoke alleges that Defendants are liable to him for excessive force, unlawful stop, unlawful search, and more, he necessarily alleges that Defendants have been untruthful in their interactions with him.  For example, he alleges that they falsely deny that they used excessive force upon him, that they falsely state that they had cause to stop his vehicle in the first place, and that they falsely claim that their extensive search of the vehicle was justified by a lawful arrest.  Thus, regardless of Defendants' opinion of whether Mr. Akpoke's conviction for disorderly conduct forecloses a false arrest claim here, Mr. Akpoke is entitled to discovery relating to Defendants' truthfulness in all representations they made in connection with this incident, and that includes his arrest.  Assuming, arguendo, that Mr. Akpoke's false arrest claim is dismissed on summary judgment, I argue that Mr. Akpoke could still present evidence at trial that Defendants' misrepresented that the knife met the statutory definition of a gravity knife in an effort to convince the jury on his surviving claims that Defendants also made false statements relating to the use of force and/or the justification for the stop and search.

Next, I also believe that Mr. Akpoke is entitled to discovery relating to his false arrest claim for the simple reason that he has a viable false arrest claim.  The Court and the Parties discussed Plaintiff's theory in this regard at the last conference.  After that conference, in light of the Parties' ongoing disagreement on the topic, I wrote out my theory of the claim in a June 6, 2016, letter to Defense counsel.  Exhibit C.  In effect, my false arrest theory is that Defendants have admitted that what they initially arrested Mr. Akpoke for was possession of the machete (which was not unlawful) such that there was a period of wrongful detention between that moment and the moment when Defendants claimed to have found a superceding reason to arrest him.  As Mr. Akpoke contends that Defendants never subjected his folding knife to any tests designed to determine whether it met the statutory definition of a gravity knife, a question of fact exists as to when Defendants claim to have reasonably formulated that belief.

Thus, discovery relating to the gravity knife is relevant to Mr. Akpoke's good faith false arrest claim.  As just one example of relevant discovery in this regard, I have asked for Defendant Hesterhagen's gravity-knife training and arrest history.  Defendant Hesterhagen, who had been on the force for a relatively short period of time at the time of this incident, claimed on Mr. Akpoke's arrest paperwork that he had conducted an unusually high number of gravity-knife arrests.  As another example of relevant discovery, I wish to have knife expert Jim Furgal inspect Mr. Akpoke's knife, which

remains in Defendants' possession and control.  I would like to explore these and other issues bearing on the claim that the knife was a gravity knife.

       Thank you for your time and consideration.  I am happy to provide additional information as requested.

                                      Sincerely,

                                      *Ryan Lozar*

                                      Ryan Lozar
                                      Attorney for Plaintiff Nchewi Akpoke