UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

NCHEWI AKPOKE,

                            Plaintiff,

 -against-

CITY OF NEW YORK, NYPD OFFICER ROBERT
HESTERHAGEN, individually, NYPD OFFICER
DANIEL GOLAT, individually, NYPD OFFICER
MICHAEL DICECCO, individually,

                           Defendants.

------------------------------------------------------------- x

No. 15 Civ. 6960 (ILG) (CLP)

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

RYAN LOZAR, ESQ.
305 Broadway, Suite 1001
New York, New York 10007
(310) 867-1562

*Attorney for Plaintiff*

## Preliminary Statement

At issue in this troubling case is a claim relating to an unlawful search that occurred during a July 2, 2015, traffic stop resulting in Plaintiff's arrest, and related failure-to-intervene and Monell claims. While Plaintiff, a hard-working young man with no criminal record, believes that various Fourth Amendment rights violations occurred during the incident, he acknowledges that he is precluded as a matter of law from challenging many of them (he accepted a disorderly-conduct-violation plea to settle the Desk Appearance Ticket (DAT) he received during the encounter).

Accordingly, Plaintiff's unlawful-search and related failure-to-intervene and Monell claims arise solely from Defendants' unprivileged search of his vehicle's dashboard after Defendants handcuffed and secured him for a misdemeanor per se gravity-knife-possession offense for which there was no additional evidence to collect. Exh. 6 (photos of destroyed dashboard). The facts show that, at the time of the challenged searches, the "reachable-distance" or "evidence-of-the-offense-of-arrest" exceptions to the Fourth Amendment's warrant requirement did not privilege Defendants to perform further searches of Plaintiff's vehicle (causing great damage in the process). These were fishing expeditions for evidence unrelated to the arrest offense. See Arizona v. Gant, 556 US 332 (2009).

## I.     Factual Summary.

In the summer of 2015, Plaintiff was working two part-time jobs—one at Jimmy John's sandwich shop in Staten Island, and one at Three Brothers Pizza in Staten Island. Exh. 1 at 60:20-62:24. These jobs involved customer service, unpacking and breaking down boxes, and delivering food orders to Staten Island customers. Id. at 61:7-9, 63:23-25. Plaintiff made these food deliveries in a 2001 Mitsubishi Galant, which he bought in 2014 for $2,000. Id. at 65:6-7;

1

Exh. 7. As Defendants imply in their Rule 56.1 Statement, the Galant was not likely to win any car-show prizes. It was fourteen-years old, had dents, did not have air-conditioning, and there was one single crack in the dashboard's plastic. See Def. 56.1 ¶¶ 8-14. But this was Plaintiff's car.

In the summer of 2015, Plaintiff lived in an apartment with his girlfriend on Staten Island, but regularly visited and stayed with his parents at the family home on Prospect Street nearby, in part to help his mother with his father's medical care. Exh. 1 at 72:15-21. Plaintiff's mother cultivates a large garden in her backyard and, on one of Plaintiff's visits in late June 2015, Plaintiff brought a machete to cut away branches and bushes for her. Id. at 123:2-12; Exh. 8 (photos of garden). When done, Plaintiff returned the machete to its black canvas sheath, put it on the Galant's backseat, and left. Id. at 124:9-19.

On July 2, 2015, Plaintiff worked a shift at Jimmy John's, then went to meet his friends Devere and Prince at Devere's house, where the three planned to work on a computer music project. Exh. 1 at 76:4-8, 77:18-78:19. The three worked briefly, then Devere and Prince wanted to go to a nearby store to get food. Id. at 104:25-105:4. Plaintiff drove. Id. at 108:13-16. Devere sat in the front passenger seat and Prince got into the backseat; to get the sheathed machete out of Prince's way, Plaintiff took it off the backseat and wedged it down between the driver's seat and console. Id. at 108:17-109:2, 122:21-25.[1]

A few blocks from Devere's house, on Castleton Avenue nearing its intersection with Treadwell Avenue in the 121st Precinct, Plaintiff saw an unmarked vehicle driving from the

---

[1] Devere Coles was once a plaintiff in this action but his mother withdrew her consent that he participate (Devere was a minor at the time). In discovery, Defendants claimed that they don't remember Devere. But see Exh. 3 at 56:11-14 (DiCecco testifying that Plaintiff "and the two other defendants" were stopped, before being interrupted and corrected by Corporation Counsel). Because the issue is irrelevant to the Court's consideration of the motion, I will omit the peculiarities of Defendants' handling of him.

opposite direction flashing a tactical flashlight at him and slowing its speed. Id. at 110:13-114:7, 120:19-20; Exh. 9 (maps of general area). Defendants Hesterhagen and Golat were inside. Hesterhagen and Golat were working an Anti-Crime detail in the 121st precinct supervised by Defendant DiCecco (non-parties Jose Tabora and Genaro Barreiro were also working the tour). Officers on Anti-Crime detail work in plainclothes in unmarked cars, and they investigate serious felonies in progress. See Pl. 56.1 ¶¶ 47-48. According to Hesterhagen, one way Anti-Crime achieves this is through car stops because "it allows us to further investigate instead of just writing a summons." Pl. 56.1 ¶ 49.

Plaintiff assumed from Defendants' flashing light, deceleration and movement that they were police, and he slowed down as well. Exh. 1 at 112:8-23. Plaintiff's windows were rolled down that July evening and, when the two slowing vehicles passed one another, Defendants asked Plaintiff "Where are you going?" and "What are you guys doing?", told Plaintiff to pull over, and Plaintiff complied, despite the fact that Plaintiff had not committed any traffic violation. Id. at 113:8-10, 118:24-119:7, 122:8-9. According to Defendants, they "pulled over" the Galant because it was double-parked and they had to investigate. Pl. 56.1 ¶ 56.

Defendant Hesterhagen approached the passenger's side of the Galant. Id. at 125:14-20. Hesterhagen scanned the light around the Galant's interior and it landed on the handle of the machete that was visible from where the tool was wedged between the seat and console. Id. at 125:25-126:1. Hesterhagen asked Plaintiff what it was, and Plaintiff responded that it was a machete that he used for yard work. Id. at 125:21-22, 126:5-6; Exh. 2 at 47:4-5 (Hesterhagen testifying that the tool was wedged between seat and console); see Exh. 1 at 150:6-10 (Akpoke explaining that it was "jammed in there pretty good").

Hesterhagen told everyone to get out of the Galant. Plaintiff unbuckled and began to open his door to comply, whereupon Defendant Golat then swung Plaintiff's door open the rest of the way, grabbed Plaintiff and pulled him out. Id. at 126:11-16. During Golat's unexpected and forcible pulling of Plaintiff's body, Plaintiff struck his head on the Galant's door frame. Id. at 126:17-127:6.

By now or earlier, DiCecco was on the scene with other officers and directly participated in and/or supervised and directed the subsequent search of the Galant. Pl 56.1 ¶ 58. Defendants handcuffed and arrested Plaintiff and Prince for possession of the machete. Pl. 56.1 ¶ 70.

Although this is the "fact section" of the brief, it bears mentioning here that the presence of the machete in the Galant—which Defendants do not contest was sheathed and wedged between the seat and console—was not an arrestable offense. In recognition of the fact that a machete and other items listed in New York Penal Law Section 265.01(2) are everyday tools with "non-violent uses," the law criminalizes possession of machetes and other items in this part of the penal law when an individual demonstrates "intent to use the same unlawfully against another." N.Y. Pen. L. § 265.01(2); People v. Campos, 93 A.D.3d 581, 581 (1st Dep't 2012) ("[s]ome weapons are illegal per se, regardless of intent, but a machete is not one of those weapons"). Defendants testified that the Galant's occupants were compliant, calm, non-violent and never exhibited suspicious behavior, and never made any physically-threatening movements. Pl. 56.1 ¶ 18. Furthermore, while New York City law prohibits possession of a knife with a blade length of four inches or more in a "public place," a vehicle does not become a public place by virtue of a police stop. See N.Y.C. Admin Code § 10-133(b); People v. Humphrey, 20 Misc.2d 879 (N.Y.C. Crim. Ct. 2008).

Now, with Plaintiff and Prince handcuffed and secured by police behind the Galant, Defendants continued to search the Galant. Because Defendants handcuffed and arrested Plaintiff and Prince for possession of the machete, they called this a Search Incident to Lawful Arrest ("SILA"). Pl. 56.1 ¶ 73. On the floor in front of the Galant's backseat, Defendants found a closed backpack, opened it, and found two items inside: (1) Plaintiff's folding utility knife (a multi-use tool with a port for screwdriver attachments), and (2) a stick that Plaintiff testified he carried when he made late-night deliveries for Jimmy John's and Three Brothers in case he was robbed. Exh. 1 at 129:22-130:10. With this, Defendants' basis for arresting Plaintiff and Prince changed to possession of the folding knife and the stick, and Defendants relatedly charged them with possession of a gravity knife and a bludgeon, respectively (arbitrarily imputing possession of each item to one individual). See N.Y. Pen. L. § 265.01(1). The machete-possession "arrest" that gave rise to the "SILA" now dropped out of the picture. The gravity-knife and bludgeon possession charges are per se offenses and depend upon whether the knife and the stick meet the statutory definition of gravity knife and bludgeon. Id. They are not intent-based possession offenses. Id.

As noted supra, Plaintiff believes that, among other things, the traffic stop and the search of his backpack were Fourth Amendment violations. However, those events are not the subject of his case. Plaintiff brings an unlawful-search and related failure-to-intervene and Monell claims against Defendants for the following events.

After finding the knife and stick in the backpack, which became the new basis for arrest, Defendants continued to search the Galant for approximately ten minutes. Exh. 1 at 135:1-5. During this period, while handcuffed and secured by police behind the Galant, Plaintiff heard

plastic snapping as his dashboard was broken apart pursuant to this search. Id. at 136:17-22, 190:2-3.

Hesterhagen testified that the search was part of what was in the arrestees' "lungeable areas." Pl. 56 ¶ 82. DiCecco testified generally that when police arrest an individual for offense "A," this gives rise to authority to search the arrestee's vehicle for evidence relating to other offenses such that the arrestee may be arrested for "B and C" as well. Pl. 56.1 ¶ 70.

Defendants' search of the Galant's dashboard yielded no contraband to permit charging Plaintiff or Prince with "B and C" offenses. Pl. 56.1 ¶ 73. Within two hours, Defendants gave Plaintiff a Desk Appearance Ticket (DAT) for misdemeanor per se possession of a gravity knife and released him. Exh. 20. When Plaintiff returned to his Galant, he saw the scope of the dashboard's destruction, which he had already surmised from the sounds of plastic snapping at the arrest scene during the searches. Exh. 1 at 206:9-20; Exh. 6. A month later, Plaintiff pled to a disorderly-conduct violation to settle the misdemeanor-gravity-knife-possession DAT. Pl. 56.1 ¶ 41.

## II.    Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir.2010). "A fact is material if it might affect the outcome of the suit under the governing law." Id. The court must "construe the facts in the light most favorable to the nonmoving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir.2011).

## III.    Unlawful-search claim.

Where police undertake a search to discover evidence of criminal wrongdoing, "the ultimate touchstone of the Fourth Amendment is reasonableness," <u>Brigham City v. Stuart</u>, 547 US 398, 403 (2006), which generally speaking "requires the obtaining of a judicial warrant," <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 US 646, 653 (1995). The warrant requirement "ensures that the inferences to support a search are drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." <u>Johnson v. U.S.</u>, 333 U.S. 10, 14 (1948).

There are circumstances in which a warrantless search of an individual's person or property may be reasonable and thus constitutional. The Supreme Court has discussed one such exception—the warrantless search-incident-to-lawful-arrest ("SILA") exception—relating to searches of an arrestee's vehicle. <u>See</u> <u>Arizona v. Gant</u>, 556 US 332 (2009).

In <u>Gant</u>, the Supreme Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." <u>Gant</u>, 556 US at 351; <u>see</u> <u>id.</u> at 351-53 (J. Scalia, concurring) (discussing the evidence exception as tethered to "the triggering event"). In that case, police arrested a man for driving with a suspended license, handcuffed and secured him in a patrol car, then searched the arrestee's vehicle, finding cocaine inside the pocket of a jacket in the backseat. <u>See</u> <u>id.</u> at 335. The <u>Gant</u> Court held that the reaching-distance exception did not privilege that warrantless search. <u>See</u> <u>id.</u> In addition, it held that the evidence-of-the-arrest-offense exception did not apply, noting that "[i]n many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence." <u>Id.</u>; <u>see</u>

Davis v. US, 564 US 229, 239 (2011) (finding vehicle search relating to arrest of one individual for driving under influence and another for providing police with a false name "unconstitutional under Gant" because, among other things, the search did not qualify for evidence-of-the-arrest-offense exception).

Here, the record shows that Defendants pulled over the Galant to investigate why it was, as they allege, double parked, Pl. 56.1 ¶¶ 50, 56; that they never asked or learned anything about that alleged traffic infraction that piqued their interest so much, id. ¶¶ 76-78; that they never observed the Galant's calm and compliant occupants engage in any suspicious behavior or physically threatening movements, id. ¶¶ 54, 61-62, 67-69; and that although they initially arrested the Galant's occupants for possessing a machete that was sheathed and wedged between the seat and console, they eventually charged the Galant's occupants with per se possession of a gravity knife and a bludgeon recovered during a "SILA" that Plaintiff argues was actually not a SILA, id. ¶¶ 63, 70, 73, 82. The record also shows that Defendants then searched the Galant further while Plaintiff and Prince were handcuffed and secured by police, destroying its dashboard and searching its trunk. Id. ¶ 70.

On these facts, Plaintiff argues that the dashboard destruction and the trunk search were not performed because those areas were within the handcuffed and secured arrestees' reachable distance, one exception to the warrant exception permitted by Gant. See Davis, 564 US at 235, 239; Gant, 556 US at 335; but see Pl. 56.1 ¶ 74 (Hesterhagen testifying that he was searching "lungeable areas").

Nor do the facts fit Gant's evidence-of-the-arrest-offense exception. Once Defendants found the items giving rise to Plaintiff's arrest for gravity-knife-possession and Prince's arrest for bludgeon possession arrest, both of which are per se possession offenses, there was no

additional evidence for Defendants to collect relating to the arrest offense. See U.S. v. Cancel, 167 F. Supp.3d 584, 592 (SDNY 2016) (Gant did not justify the challenged search because the arrest was for arrest of services and knife possession, and officers had no reason to believe that they would find additional evidence of those crimes through a search); Joyner v. City of Mount Vernon, No. 09 Civ. 8982 (VB), 2011 WL 3296083, at *5 (SDNY July 25, 2011) (finding that Section 1983 plaintiff stated a claim for violation of his Fourth Amendment rights relating to a warrantless post-arrest search of his vehicle because although officers had probable cause to arrest the motorist, their authority to search his vehicle for additional evidence of criminal activity under Gant was limited where "there was no further evidence necessary to uphold the allegation against plaintiff" relating to that arrestable offense); United States v. Morillo, No. 08 Cr. 676, 2009 WL 3254431, at *5 (EDNY Oct. 9 2009) (where offense was illegally riding bicycle on sidewalk, no facts could explain why officers would think that additional evidence of that offense would have been within the individual's bag); People v. Lee, 143 AD3d 626, 638 (1st Dep't 2016) (finding search of defendant's entire car without limitation unreasonable because officers had no articulable facts to support a belief that their discovery of a marijuana cigarette meant that marijuana would be present in rest of car); see also Lozada v. City of NY, No. 12 Civ. 38 (ILG) (JMA), 2013 WL 3934998, at *5 (EDNY July 29, 2013) (drawing a distinction between investigation and arrest for the purposes of reviewing unlawful-search claim). Defendants' inability to claim that the search was justified by Gant's evidence-of-the-arrest-offense exception to the warrant requirement is further clarified by the fact that Defendants' testimony regarding the circumstances surrounding the per se possession charges was that the incident began as a traffic stop for double parking; that the Galant's occupants were compliant and calm; that the Galant's occupants exhibited no suspicious behavior other than

being "double parked;" and that the Galant's occupants never behaved in any physically threatening manner throughout the encounter. See Gant, 556 US at 351; Riley, 134 S. Ct. at 2492 ("In the vehicle context, Gant generally protects against searches for evidence of past crimes" and also "restricts broad searches resulting from . . . traffic violations."). In other words, the record is bare as to whether Defendants had constitutionally-sufficient cause to believe they would find any evidence relating to the already complete per se arrest offenses through additional searches. But see Pl. 56.1 ¶ 75 (DiCecco testifying, in sum and substance, that if you have cause to arrest on A, you go back into the vehicle to search to see if there's anything else to arrest on B and/or C, too).

Defendants seem to argue that Plaintiff's unlawful-search claim is premised upon a theory of excessive-property damage in the context of an otherwise privileged search. See Def. Memo at 13-14. That is not Plaintiff's theory. Plaintiff's argument as to Defendants' liability on the unlawful-search claim does not turn on whether the Court or a jury finds that the property damage caused to the dashboard during the search was excessive. It turns on the fact that the challenged search was wholly unprivileged. As outlined supra, Plaintiff's claim is that the timing and circumstances pursuant to which Defendants performed the challenged dashboard search—after the Galant's occupants were handcuffed and secured, and after the items supporting the per se possession charges were found—establish Defendants' liability for unlawful search. The destruction of the dashboard pursuant to that unlawful search may bear on damages.

Defendants continue their argument regarding whether and to what extent property damage may reasonably occur during an officer's execution of a search with a discussion of search warrant cases. Def. Memo at 14 (citing Vaher v. Town of Orangetown, 133 F. Supp.3d

574, 591 (SDNY 2015)). As noted by the Supreme Court in <u>Johnson</u>, 333 U.S. at 14, where a warrant has been issued, search reasonableness issues are examined under a wholly different lens because the neutral and detached formulation of probable cause insulates the situation from "the often competitive enterprise of ferreting out crime" that may color an officer's experience.

Next, Defendants argue that Plaintiff has not demonstrated that the search was unreasonably or maliciously carried out. Def. Memo at 16. Again, Plaintiff's initial position is that the dashboard search was not even arguably privileged under the Fourth Amendment, which is an objective standard, not a malice standard.

Defendants also incorrectly argue that Plaintiff's unlawful-search claim seeks to create some special Fourth Amendment rights for a person with "modest means." <u>See</u> Def. Memo at 14 n.5. To be perfectly candid, I have naturally wondered about the contrary, <u>i.e.</u>, whether a jury might disregard or overlook the constitutional equivalence of Defendants' unlawful search of the 2001 Galant as compared to a hypothetical unlawful search of a "nicer car." Given that this has crossed my mind, I was surprised to read Defendants' suggestion that I view this as a positive, particularly because Defendants dedicated no less than eight of their Rule 56.1 Statement's forty-one paragraphs—20% of its substance—to ways in which they want the Court to know that the Galant was unattractive (its age, no air conditioning, dents, etc.) even prior to the search that destroyed its dashboard. <u>See</u> Def. 56.1 ¶¶ 7-14.

Next, Defendants argue that Hesterhagen and Golat were alone at the scene such that DiCecco is not a proper Defendant. This is an issue of fact, although Plaintiff argues that there ample evidence that DiCecco was on the scene as a direct participant and/or failed to intervene to stop the unlawful search despite reasonable opportunity. For example, DiCecco's memo book reported that he was at the scene at 10:45p.m., while the vehicle stop as reported to the radio

dispatch at 10:52. Exh. 13 (DiCecco memo book); Exh. 12 (event chronology report); Pl. 56.1 ¶ 58. Next, in Plaintiff's testimony, he explained that other police vehicles were on the scene near-immediately and prior to the unlawful search that is the subject of this complaint, and DiCecco testified that he arrived when only Defendants' and Plaintiff's vehicles were on the scene. Taking these two facts together, this puts DiCecco as the first, near-contemporaneous arrival on the scene well before the search. Exh. 1 at 202:18-25; Exh. 3 at 19:8-12. Hesterhagen also reported DiCecco as having been present on the scene in contemporaneously created records. Exh. 17 at D42 (annotation in the lower left corner). Then, despite DiCecco testifying that when he arrived everything was over and Plaintiff and Prince were already handcuffed and inside Hesterhagen's and Golat's RMP 248, Exh. 3 at 18:16-19:3, this contradicts the 121st Precinct's command log, which indicates that RMP 301—which was DiCecco's vehicle—transported Plaintiff there. Exh. 11. In light of the foregoing, DiCecco's presence as the supervisor on the scene who either directly participated in the unlawful search or failed to intervene despite reasonable opportunity to stop it, is well supported by the record and at a minimum creates an issue of fact for the jury to consider on that point.

Defendants' motion also remarks upon previous discussions between the Parties and Judge Pollak regarding the relevance of Heck v. Humphrey, 512 US 477 (1994), to this case. I completely agree with Defendants' statement that an unlawful-search claim is not foreclosed by Heck where the invalidity of the search does not impugn the validity of the unlawfully-searched individual's conviction or sentence. See Def. Memo at 13. Here, Plaintiff's unlawful-search claim does not implicate the disorderly-conduct violation he took to settle the per se knife possession charge, as Defendants' challenged unprivileged search occurred after the search of Plaintiff's backpack and the discovery of the knife and stick. See Covington v. City of NY, 171

F.3d 117, 125-26 (2d Cir. 1999) (Glasser, J., dissenting) (discussing the Heck exception (the discussion as applied here is not contrary to the majority's holding) and noting that "a search can be unlawful but the conviction entirely proper, or the reverse, [when] some injury from a violation of the fourth amendment is unrelated to conviction"); Woods v. Candela, 47 F.3d 545 (2d Cir. 1995) (explaining that Heck exception applies to, among other things, certain unlawful search actions where illegality would not affect the validity of the conviction); see also Stegemann v. Rensselaer Cty. Sheriff's Office, 648 F.App'x 72 (2d Cir. May 3, 2016) (remanding a convicted arrestee's Fourth Amendment search claim).

Finally, I note that Defendants do not argue that the challenged searches were privileged as inventory searches. Nor could they on these facts. "Inventory searches serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen or vandalized property, and to guard the police from danger." U.S. v. Henderson, 439 F. App'x 56, 58 (2d Cir. 2011) (citing Colorado v. Bertine, 479 US 367, 372 (1987)). However, Defendants' destruction of the Galant's dashboard plainly does not fall within the inventory-search exception as a routine "police caretaking procedure." Id.; see U.S. v. Mendez, 315 F.3d 132, 137 (2d Cir. 2002). Defendants did not invoice the Galant or inventory or invoice its contents. After the challenged searches at the arrest scene, Defendants released the Galant to Plaintiff within two hours of the stop and arrest after giving him a DAT. See People v. Lee, 143 A.D.3d 626, 627-28 (1st Dep't 2016) (endorsing an inventory performed pursuant to patrol guide procedures in which contemporaneous list was made of items removed and property invoices made of the same).

## IV. Failure-to-intervene claim.

Defendants argue that the Court may not permit Plaintiff's direct-participation and failure-to-intervene claims against them to proceed beyond summary judgment. Plaintiff

disagrees. This Court has held that a plaintiff is entitled to proceed to trial with a failure-to-intervene claim as an alternative to direct liability; otherwise, at trial, witness testimony may unexpectedly situate an Individual Defendant's liability within a prematurely abandoned or dismissed claim. See Lanorith v. Truscelli, No. 15 Civ. 617 (NGG) (LB), 2017 WL 3634600, at *13 (EDNY Aug. 22, 2017) (denying summary judgment based on argument that only direct-participation or failure-to-intervene may proceed to the jury); Buchy v. City of White Plains, No. 14 Civ. 1806 (VB), 2015 WL 8207492, at *3 (SDNY Dec. 7, 2015) (denying summary judgment motion on failure-to-intervene claim, noting that it may proceed past summary judgment stage in the alternative). As for Defendants' complaint that they may not be found liable for direct violation of Plaintiff's right and failure to intervene, the concern can easily be resolved through (1) Plaintiff's voluntary withdrawal of claims as appropriate once the trial record is complete, or (2) jury instructions and a clear verdict sheet. In this manner, the jury will be left to determine whether an Individual Defendant unlawfully searched Plaintiff's dashboard by breaking it apart, failed to intervene despite a reasonable opportunity while one of his colleagues performed the unlawful search, or neither, while also being instructed that it cannot find both. The importance of preserving the alternative theory of liability is particularly strong in this case, where Defendants each deny committing the complained-of act, and Plaintiff did not have sufficient opportunity to itemize what Defendant was doing what on the scene and when due to, inter alia, the incident occurring at night, Plaintiff having suffered head trauma when he banged his head on the door frame, certain Defendants wearing hats and glasses, the number of officers on the scene, Defendants' release of Plaintiff in roughly two hours with a DAT, and more. Exh. 1 at 128:20-25; see Cumberbatch v. Port Auth. Of NY and NJ, No. 03 Civ. 749, 2006 WL 3543670, at *11 (SDNY Dec. 5, 2006) (refusing to dismiss failure-to-intervene claims at summary

judgment, while acknowledging that a direct actor cannot be found to have failed to intervene against himself, stating that "[t]he Court will . . . construe these claims . . . in the alternative . . the Officers either used excessive force, or one or both of them failed to intervene while another officer used excessive force.").

## V.    **Monell claim.**

For a Monell claim based on failure to train or supervise, a plaintiff's evidence must permit a reasonable jury to find (1) that a policymaker knows to a moral certainty that an employee will confront a given situation, (2) that that situation will either present the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of the employee mishandling the situation, and (3) that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. See Walker v. City of N.Y., 974 F.2d 293, 297-300 (2d Cir. 1992) (citing and synthesizing case law). I will hereinafter refer to a plaintiff's successful demonstration of these elements as the "known risk." Then, a plaintiff must show a direct causal link between the City's deliberate indifference to the known risk—which may manifest in City action or inaction—and the alleged constitutional deprivation. Id. "This does not mean that the plaintiff must show that the municipality had a stated rule or regulation." Vann v. City of NY, 72 F.3d 1040, 1049 (2d Cir. 1995). The known risk may be demonstrated by repeated complaints of civil rights violations, and deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to forestall further incidents. Id. In Vann, the Second Circuit held that where an officer had been identified by the police department as a violence-prone individual who frequently made quick-tempered demands for respect, a rational jury could find that the municipal employer knew of an obvious need to more closely supervise him after he was

reinstated to duty. See HH v. City of NY, No. 11 Civ. 4905 (NG) (ST), 2017 WL 3396434, at *8 (EDNY Aug. 7, 2017) (denying summary judgment on Monell claim because record contained evidence that City knew "of a long list of allegations about [an officer's] behavior that a reasonable jury could conclude should have alerted them to the need to better supervise him").

Here, Plaintiff similarly argues that a reasonable jury could find from the number, nature and timing of CCRB complaints, notices of claim and federal civil rights litigations filed against certain Defendants prior to July 2, 2015, that the City Defendant was on notice that, absent better training and/or supervision of these Defendants, the Defendants were likely to violate other individuals' rights in the future. To begin, it is relevant that the CCRB complaints, federal lawsuits and NOCs described here are clustered in a two-year period prior to the July 2, 2015, incident. They are all close in time to each other and close in time to Plaintiff's unlawful search (within two years on both axes). I will talk more about the substance of the CCRB complaints and the federal lawsuits/NOCs below, but beginning from this temporal "coincidence" alone, a jury could plausibly infer that the City Defendant as a reasonable employer would view the sudden appearance of a cluster of five CCRB misconduct allegations and three federal civil rights lawsuits and/or notices of claim against one Defendant in the two years preceding the July 2, 2015, incident as showing that a known risk of potential additional constitutional violations had emerged. Cf. Granato v. City of NY, No. 98 Civ. 667 (ILG), 1999 WL 1129611, at *9 (EDNY Oct. 18, 1999) (stating that five complaints in eight years was insufficient to place City Defendant on notice). Moving beyond the unusual temporal proximity of these complaints to each other as well as to the Defendants' July 2015 unlawful search of the Galant, I will now

briefly discuss the facts and significance of the five clustered CCRB complaints against this particular Defendant in turn.[2]

First, one of the CCRB complaints contained an unlawful-search allegation that was substantiated against the Defendant in June 2015—less than a month prior to the unlawful search of Plaintiff's Galant. Exh. 29. In that case, the complainant alleged that the Defendant was driving an unmarked car when he unlawfully stopped the complainant's vehicle then unlawfully searched the plaintiff's person. Id. It was not until 2016 that the Defendant actually received three days of related remedial corrective training on, inter alia, Fourth Amendment principles. Exh. 30. The June 2015 substantiated unlawful-search finding and its close temporal proximity to Plaintiff's unlawful search in July 2015 would permit a jury to infer that the City's deliberate indifference to the known risk established by CCRB's substantiated finding—manifested by its delay in imposing corrective disciplinary or supervisory action—proximately caused Plaintiff to suffer the July 2015 unlawful search.[3] (It should also be noted that this CCRB complainant

---

[2] I apologize for referring vaguely to "the Defendant" when discussing disciplinary matters, which I realize does not make for a model of clarity. Previously, due to the Confidentiality Order, I referred to Defendants in such vague terms in a motion before Judge Pollak. Defendants objected and asked to seal the filing, and Judge Pollak ruled that I referenced the individuals in "sufficiently broad terms so as not to identify the specific incident to which [I] was referring or the officer against whom the allegations were made." Docket No. 42. Accordingly, I will follow this approach. If the Court disagrees in light of the fact that the documents are now more squarely judicial documents due to their relevance to the Court's adjudicatory review of the case's merits, I will resubmit the filing with more pointed identifications.

[3] As the Court will undoubtedly note, the material appearing at Exhibit 29 and Exhibits 31 through 39 is very heavily redacted. Because I view the redactions to be without lawful justification in many respects, I filed a motion asking Judge Pollak to compel Defendants to remove the redactions so that the material could be more easily read and so that I could contact the complainants and notice them as fact witnesses for trial in the event Plaintiff's claims survive summary judgment. Exh. 43 (copy of Plaintiff motion to compel the removal of redactions and reproduction pursuant to the terms of the Parties' Confidentiality Order). Insofar as I indicated to Judge Pollak that the material permitted me to make my summary judgment arguments prior to litigating the propriety of the redactions, Judge Pollak stated that Plaintiff has leave to renew the motion to compel to prepare for trial depending on Your Honor's decision of the summary judgment motion. Exh. 40 (copy of the docket, Judge Pollak's Order at Docket Entry 6/21/2017).

alleged that the unlawful search of his vehicle resulted, as in Plaintiff's case, in damage to the dashboard of his vehicle (ripped out wires, as opposed to broken-apart plastic).)

A second CCRB complaint from the five made within the two years against this Defendant contained an unlawful-traffic-stop allegation that was substantiated against the same Defendant arising from a November 2014 incident. Exh. 31. In this instance the CCRB did not enter its substantiated finding until after July 2015. Id. However, even prior to the substantiated finding's formal entry, the investigation revealed a problem relating to this Defendant because, by July 2015, CCRB's investigation had already revealed that the Defendant had wholly failed to create three required records to document the stop. Id. A jury could find this established failure to document a traffic stop in two standard records required for that purpose, taken together with the problematic and similar allegations in the four other closely clustered CCRB complaints, to provide a reasonable employer with notice that this Defendant was obfuscating his use of traffic stops to perform Anti-Crime work. Id.

The third and fourth CCRB complaints in this very closely-clustered series of five factually similar complaints were unsubstantiated. Exh. 33; Exh. 34. Plaintiff recognizes that one unsubstantiated complaint when viewed in isolation is, generally speaking, less compelling on its face than if it had been substantiated. However, Plaintiff argues that a jury could still find these specific unsubstantiated complaints to be compelling evidence when taken together with other facts for various reasons. First, I note that "a finding that an allegation is 'unsubstantiated' means that the investigating officer was unable to determine, based on the evidence gathered, whether the allegation was true or false." H.H. v. City of NY, No. 11 Civ. 4905 (NG) (ST), 2017 WL 3396434, at *2 (EDNY Aug. 7, 2017). Although CCRB investigators felt they did not have evidence tipping their own view one way or the other in each of these two unsubstantiated

complaints when they were considered as stand-alone matters, a jury viewing them in the context of all five CCRB complaints (as well as a similarly sudden emergence of the federal civil rights lawsuits discussed infra) and conclude that the factual similarities present in them and temporal proximity between them showed that the City Defendant was on notice of a known risk that it should reasonably have addressed through additional training and/or supervision of the Defendant.

Turning a closer eye to one of these two unsubstantiated complaints, a jury would note and could find it significant that it deals again with an unlawful-traffic-stop allegation by this particular Defendant "investigating a parking violation" in plainclothes from an unmarked car. Exh. 33. Considering that Anti-Crime is meant to find felony crimes in progress, a jury could find it an unlikely coincidence—even with an unsubstantiated finding—that various individuals falsely complained that this Defendant was unlawfully stopping their cars without cause and committing other ensuing misconduct. Furthermore, CCRB remarkably commented in this case that this Defendant's explanation for the stop was the "least consistent" with all other testimony taken from parties and witnesses (who included other police officers), and also noted that the challenged stop did not give rise to a traffic infraction or other charge as one might think would be true given the Defendant's story. Id. A jury in this case could look past CCRB's institutional unwillingness to draw an inference from these indicia of incredibility to draw its own inference that the investigation, which closed in 2015 prior to the unlawful search of Plaintiff's Galant, shows a known risk of which the City Defendant had notice. Id.

As for the second of the two unsubstantiated complaint, the complainant alleged that the Defendant was involved in the unlawful search of a vehicle stopped in the first instance for a headlight violation, and that the Defendant then directed officers to "toss" the car. Exh. 34. A

jury considering this allegation of unsettling aggressiveness in directing a search, particularly when viewed alongside all the other complaints, could again conclude that it has probative value contributing to the collective pre-July 2015 proof that the City Defendant had notice that better training or supervision of this Defendant was necessary to prevent his likely violation of individuals' constitutional rights going forward.

Finally, in the fifth CCRB complaint against this Defendant during this period, the complainants eventually failed to engage in follow-up investigative efforts. However, the case still has notable aspects and probative value, not least because it involved the Defendant working with a Second Defendant on a team. Exh. 36. This punctuates why the City Defendant's deliberate indifference to the known risk posed by this particular Defendant is so egregious, i.e., his influence on his colleagues. Here, the complainants again alleged that the misconduct occurred with the Defendants in plainclothes and an unmarked car. Id. According to the male complainant, the Defendants knew him from a previous arrest and, on the date of the complained-of conduct, stopped him as he stood outside waiting for his girlfriend to arrive from the grocery store simply because they recognized him. Id. The Defendants searched him, found no contraband, and did not arrest or summons him. Id. Just then, the male complainant's girlfriend arrived on the scene carrying grocery bags. Id. The Defendants then stopped and searched her, and arrested her for having the male complainant's prescription medication in her purse.[4] Id.

---

[4] There is another unlawful-stop allegation against this Defendant that I am relegating to this footnote because it is at a temporal remove from the other five complaints. However, I reference it briefly here because it once again is about an unmarked car and an arbitrary stop. Exh. 32. This time, the arbitrary stop and handcuffing was of a minor who just shortly before stepped out of a church service with her family. Id. The family and others intervened to explain to the Defendant and other officers they had just been with the minor at the service, and no arrest or summons was made, and the file provides no concrete information for why the minor was stopped in the first instance. Id. The was a mediation to address the complainants' upset.

Finally, the Second Defendant who was jointly involved in the February 2014 complaint was the subject of two other CCRB complaints with similar allegations, again within two years prior to the Plaintiff's July 2015 unlawful search. One of these arose from a January 2014 incident in which the complainant alleged that the Second Defendant arbitrarily stopped, searched and released him while asking questions about a shooting that had occurred in the neighborhood about which the complainant knew nothing. Exh. 35. The other arose from an August 2014 traffic stop of a partially paralyzed man with no criminal record who declined to leave his vehicle because he thought he had been profiled. Exh. 37. The CCRB exonerated this Second Defendant of a direct unlawful search, but did not address whether the Second Defendant should have intervened to stop other officers from a subsequent search of the complainant's vehicle, even though the Second Defendant's testimony demonstrated that he had ample opportunity to do so, and the complainant, who received three minor traffic summonses which he at least partially contested the veracity of, complained that the search's scope went far beyond what was necessary for a traffic stop. Id. The complainant in the August 2014 incident wrote an email to CCRB stating that he hoped his complaint would help "make these officers understand that what they're doing is wrong. . . To have a gun pointed at me, threatened and accused of being a drug dealer because I'm a young black man is unacceptable. I hope you understand the importance of this issue and thank you for helping me." Id. The complainant also shared photographs with CCRB regarding what the complainant viewed to be wanton treatment of his property in the vehicle's interior during the complained-of search, pursuant to which his glove compartment and bag's contents were dumped out. Id.

In addition to the above-described cluster of CCRB complaints, some substantiated, all factually similar and all extremely close in time to the Plaintiff's July 2015 unlawful search, Plaintiff notes that at the time of Plaintiff's July 2015 unlawful search, the City Defendant was also on notice of at least three federal lawsuits and/or notices of claim filed against DiCecco arising in 2014 and 2015, Exh. 23-25, Pl. 56.1 ¶¶ 87-89, and one relative to Golat, Exh. 22, Pl. 56.1 ¶ 86.  Adding these to the factual landscape, a jury could even more plausibly infer that this amounts to a unique volume of factually similar and temporally proximate misconduct complaints that placed the City Defendant on notice of a problem that corrective training and supervision was required to address to prevent future constitutional violations of the sort that Plaintiff experienced.  See Edwards v. City of NY, No. 14 Civ. 10058, 2015 WL 5052637, at *6 n.3 (SDNY Aug. 27, 2015) (stating that it is irrelevant whether the lawsuits were settled, or whether the CCRB complaints were substantiated, unsubstantiated, etc., or how many of these complaints was accompanied by irrefutable evidence of actual wrongdoing, because the Monell question begins on the subject of notice, and on these facts a jury could find that a reasonable employer was on notice that this proliferation of similar misconduct allegations required corrective action through more or better supervision); see Vann, 72 F.3d at 1050 (finding that a reasonable jury could conclude that the City's handling of complaints against an officer bespoke indifference even though the complaints were unsubstantiated, because there was evidence that they could nevertheless have been true); Fiacco v. City of Renselaaer, NY, 783 F.2d 319, 331 (2d Cir. 1986) (finding that the evidence supported jury verdict on Monell claim because the jury could have rationally concluded that during the two years prior to [the plaintiff's] arrest, the municipality's response to complaints of use of excessive force by its officers was uninterested and superficial); Calderon v. City of NY, 138 F. Supp.3d 593, 611-12 (SDNY 2015) (To allege

the existence of a pattern of misconduct, plaintiffs "often point to the filing of other complaints and/or lawsuits bringing similar claims."); Sango v. City of NY, No. 83 Civ. 5177, 1989 WL 86995, at *2-3, 14 (EDNY July 25, 1989) (three unsubstantiated and one partially substantiated complaints were sufficient to defeat summary judgment on Monell claim by showing insufficient investigation).

Finally, it is Plaintiff's view that all of the above-cited facts—the similar complaints of unfounded traffic and pedestrian stops made close in time to one another and to Plaintiff's July 2015 unlawful search, accompanied by observations of incredibility and notations of poor recordkeeping that can be construed as intentional obfuscation—cannot be divorced from the fact that much of it occurred with unmarked, plainclothes Anti-Crime operations as the backdrop. See Cash v. Cty of Erie, 654 F.3d 324, 337 (2d Cir. 2011) ("[E]ven where [the] need for [a] different policy would not be obvious to a stranger to the situation, a particular context might make the need for training or supervision so obvious that a failure to do so would constitute deliberate indifference."). A reasonable jury could plausibly infer from its own common sense and wisdom that the plainclothes, unmarked-vehicle Anti-Crime operations of the Defendants giving rise to this misconduct-complaint cluster put the City on notice that one of the Defendants in particular was improperly employing traffic stops and pedestrian stops to initiate broader investigations of individuals at random without particularized cause. If a jury so finds, it could relatedly infer that the City Defendant was deliberately indifferent to its obligation to reasonably address the known risk that this posed through increased training and/or supervision but did not, proximately causing Defendants' July 2015 unlawful search of Plaintiff's Galant.[5] See DeCarlo

---

[5] I also note that the plausibility of a jury finding that the City Defendant knew before July 2015 that the unaddressed known risk was likely to give rise to additional constitutional violations is circumstantially borne out by the fact that Defendants have been the subject of still another cluster of federal civil rights lawsuits addressing allegations that that in fact occurred. Counting Plaintiff's complaint, four civil rights

v. Fry, 141 F.3d 56, 61-62 (2d Cir. 1998) (a plaintiff may show a municipality's deliberate indifference by inference from proof of notice but failure to address charges that the municipality's agents were violating citizens' constitutional rights); Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983) ("[M]unicipal inaction such as the persistent failure to discipline subordinates who violated civil rights could give rise to an inference of an unlawful municipal policy[.]").

## VI.    Defendants' FRCP 11 motion.

Defendants have built a FRCP 11 motion for sanctions into their motion. I ask that the Court permit me to respond in opposition to the FRCP 11 motion after the Court's consideration of summary judgment and the Parties' submissions. I make this request because Defendants' conflation of a FRCP 11 motion with a summary judgment motion creates a peculiar procedural posture. I have limited space to oppose summary judgment, and the opposition papers are my primary argument and exhibit as to why Plaintiff's claims are good faith and not frivolous. If the Court denies Defendants' motion in whole or in part, Plaintiff believes that the Defendants' FRCP 11 motion will be correspondingly rendered moot. To the extent the Court grants some part of Defendants' motion, that will permit the Parties and the Court to discuss any alleged frivolity with more specificity than Defendants' motion now permits. However, there is one aspect of Defendants' accusation of frivolity that I would like to address now. Defendants inaccurately state that Judge Pollak "told plaintiff's counsel that he should convince his client to withdraw the case" during pretrial management. See Def. Memo at 10. This is an incomplete and reductive description of what occurred. At the May 16, 2017, conference to which

_____

violations have been brought against the various Defendant members of this Anti-Crime team. This number does not include non-party Anti-Crime members in the 121st Precinct working under DiCecco's supervision. See, e.g., Exhs. 26-28.

Defendants refer, Plaintiff narrowed his action by withdrawing his excessive-force claim, and

Judge Pollak instructed me to speak to Plaintiff regarding whether and to what extent he wished

to proceed with the remaining unlawful-search and related failure-to-intervene and <u>Monell</u>

claims. In response, I researched relevant law, conferred with Plaintiff about his remaining

claims, which are discussed herein, and I wrote a lengthy letter to Judge Pollak explaining

Plaintiff's decision and his explanation for it. <u>Exh. 40</u> (copy of docket showing <u>Docket Entry

5/16/2017</u>); <u>Exh. 41</u> (Judge Pollak's order directing me to discuss with Plaintiff "if he wishes to

withdraw his claims"); <u>Exh. 42</u> (my June 16, 2017, letter to Judge Pollak with exhibits stating

and explaining Plaintiff's intentions).

**VII.   Conclusion**

In light of the foregoing, Plaintiff requests that the Court deny Defendants motion for

summary judgment in its entirety.

DATED:        October 2, 2017
              New York, New York

                                                    RYAN LOZAR
                                                    Attorney for Plaintiff Nchewi Akpoke
                                                    305 Broadway, 10th Floor
                                                    New York, New York 10007
                                                    Telephone 1-310-867-1562
                                                    Facsimile 1-877-666-4456
                                                    ryanlozar@gmail.com